UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Michelle M., | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 18 CV 50003 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Saul, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION AND ORDER[1]

Plaintiff Michelle M. alleges that ongoing pain, numbness, and tingling in her back, elbows, hips, hands, and feet prevent her from working full-time. Plaintiff's doctors have offered a series of possibly overlapping diagnoses to explain her symptoms—including degenerative disc disease, fibromyalgia, psoriatic arthritis, diabetes, and carpal tunnel syndrome in her right hand. But no single consistent diagnosis has yet been settled upon. Plaintiff's treatment mostly took place in the two years leading up to her hearing, and this treatment occurred on a parallel track with the progression of her legal case at the administrative level. For example, she first began seeing a pain management specialist just a month before the hearing. The late-breaking nature of this treatment complicated the adjudication of plaintiff's claim, mainly because 200 pages of treatment records were submitted after the State agency doctors rendered their opinions.

The administrative law judge ("ALJ") found that plaintiff was not disabled based on two main rationales: (1) the objective medical evidence—x-rays, MRIs, physical examination findings—indicated only mild problems; and (2) plaintiff had limited treatment that was likewise

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.

1

consistent with only mild problems. Plaintiff raises numerous arguments for remand, but her most encompassing argument is that the ALJ improperly "played doctor" repeatedly throughout the five-step analytical process. The Government's main counter-argument is that any possible errors were harmless. After reviewing the briefs, the Court does not agree with all or even most of plaintiff's contentions, but finds that overall plaintiff has raised enough—just enough— concerns and questions to justify a remand.

## BACKGROUND

Although plaintiff has stated that some of her problems may have been present since birth or even caused by a fall when she was six years old, the relevant medical history for our purposes begins in late December 2014 when plaintiff stopped working because of her health problems. Her primary physician was Dr. Schock. However, because plaintiff lost her health insurance when she stopped working, she had to switch doctors. R. 55. She then began seeing Dr. Dennis Norem who oversaw her care in 2015 and 2016. Plaintiff saw him six times in total.

On March 17, 2015, plaintiff filed disability applications under Title II and XVI. Plaintiff was then 36 years old.

On July 13, 2015, plaintiff was examined by Dr. K.P. Ramchandani, a consultative examiner, who prepared a report that was later relied on by the two State agency doctors. He made the following findings, among others:

> [Plaintiff's] gait is normal, unassisted. She is able to walk on heels and toes. She is able to squat and get up from squatting position without support. She is able to get on and off the examination table without assistance and dress and undress without assistance. She is right-handed. Her grip is 5/5 bilaterally. She is able to make a fist, pick up objects, open and close the door, oppose the thumb to fingers, and flip pages.

* * *

> Motor system: Power is 5/5 with normal tone and muscle mass in all 4 extremities. Sensory system: She has tingling in right hand on tapping the right flexor aspect of right wrist joint, no deficit to touch and pinprick in all 4 extremities. Deep tendon reflexes are 2+, going down plantars bilaterally.

R. 368.

On August 6, 2015, Dr. Towfig Arjmand, a State agency physician, opined that plaintiff had the residual functional capacity ("RFC") to do medium work with certain limitations. Exs. 1A, 2A.

On August 17, 2015, Dr. Norem completed a four-page RFC questionnaire, offering various assessments which, if credited, would support a finding of disability. Ex. 7F.[2]

On September 23, 2015, Dr. Victoria Dow, another State agency physician, issued an opinion. Exs. 5A, 6A. Dr. Dow found that plaintiff had the RFC to do light work, which differed from Dr. Arjmand's finding that plaintiff could do medium work. Dr. Dow indicated that she had reviewed recent x-rays not reviewed by Dr. Arjmand. R. 101.

Dr. Norem eventually referred plaintiff to Dr. Hovis, a rheumatologist. At a visit on September 23, 2015, plaintiff reported that she was taking several medications (Gabapentin, Tramadol, and Ibuprofen), but they had not been effective. R. 426. On examination, Dr. Hovis noted that plaintiff had no synovitis, pain, or impaired range of motion, but the doctor did observe a number of positive tender points. R. 429. Dr. Hovis noted that plaintiff had "[n]o active Psoriatic arthritis at this time" and concluded that her pain was "probably related to fibromyalgia." R. 430. Dr. Hovis recommended Effexor to treat the fibromyalgia. *Id.*

---

[2] A week later, Dr. Norem submitted a letter, stating only that plaintiff was under his care and was "unable to work at this time due to [her] medical condition." R. 375.

Plaintiff saw Dr. Hovis again on January 13, 2016, and reported that the Gabapentin and Effexor did not help and made her "feel foggy." R. 421. Dr. Hovis again observed that there was no evidence of psoriatic arthritis but that there was ongoing fibromyalgia. R. 422. Dr. Hovis advised plaintiff to do low impact exercises. *Id.* It does not appear that plaintiff saw Dr. Hovis after this time, and it is not known why the relationship stopped.

On September 2, 2016, Dr. Norem completed another medical questionnaire, reaching similar conclusions to the earlier one. Ex. 10F.

In the fall of 2016, Dr. Norem referred plaintiff to Dr. Maxim Gorelik, a pain specialist. Plaintiff saw him several times before the hearing. On October 5, 2016, Dr. Gorelik administered a steroid injection to plaintiff's right hip. R. 474. On October 13, 2016, an MRI was taken. Dr. Gorelick was contemplating at this time whether to do a spinal injection because the hip injection had been ineffective. This was several weeks before the hearing, which was held on November 3, 2016.

At the hearing, Plaintiff testified that she was living with her aunt who was disabled. Since 2002 she had worked full-time as a live-in home health aide for her aunt. She stopped doing this job, for which she was paid, in December 2014 because of her health problems.

She testified that her pain rose to a 9 on a 10-point scale after walking longer than 10 to 15 minutes. She could not lift more than a couple pounds. If she lifted more weight, her back would "completely lock up and cause intense pain." R. 41. Her elbows were always inflamed because of her psoriatic arthritis. She had trouble sitting, and she couldn't go to the movies because her tailbone area would become numb. Over the last several years of treatment with

multiple doctors, plaintiff had been trying to find the "root cause" of her inflammation and pain. R. 46.

On March 16, 2017, the ALJ found that plaintiff did not qualify as disabled. At Step Two, the ALJ found that the following impairments were severe: "degenerative joint disease of the cervical, thoracic, and lumbar spine; fibromyalgia; psoriasis; and right hand carpal tunnel syndrome." R. 17. Here, the ALJ essentially accepted every diagnosis made by any treating doctor. At Step Three, the ALJ considered whether plaintiff met one of four listings—14.09, 1.02, 1.04, and 8.05—but concluded in a fairly brief analysis that plaintiff did not.

In the RFC analysis, the ALJ summarized the medical history, offering occasional analysis along the way, and then concluded that plaintiff lacked credibility for two reasons, discussed further below. As for the medical opinions, the ALJ gave "substantial weight" to Dr. Dow's "light work" RFC finding and "less weight" to Dr. Arjmand's "medium work" finding because Dr. Dow "had the opportunity to review additional medical records including medical imaging of the claimant's spine." R. 21. As for Dr. Norem's two opinions, the ALJ evaluated them using the six factors from the treating physician rule and concluded that they deserved only "minimal weight" even though he was a treating physician. R. 22-23. Among other things, the ALJ noted that plaintiff did not have an "extensive treatment relationship" with Dr. Norem, having seen him only six times in total, with only three visits before the first opinion was rendered. The ALJ also found that Dr. Norem's findings only showed "mild changes in the spine" and the "absence of inflammation in the joints," and that plaintiff had a "normal gait, full strength in the extremities, and intact sensation and reflexes." R. 22.

**DISCUSSION**

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at *19-20 (N.D. Ill. Oct. 29, 2014).

In her two briefs, plaintiff has showered the Court with many arguments and sub-arguments, attacking the ALJ's decision from multiple angles. Some are broad while others are tightly focused on specific pieces of evidence. The three main arguments, at least as identified by the Roman numeral headings in the opening brief, are the following: (1) the ALJ erred in failing to obtain an updated medical opinion because over 200 pages were added to the record after the

State agency physicians rendered their opinions; (2) the ALJ erred in playing doctor in various ways; and (3) the ALJ erred in analyzing the medical opinions and in specifically rejecting Dr. Norem's opinions. But many more arguments are embedded within these three, and there is much overlap among the arguments. After triaging these arguments, the Court finds that plaintiff's best argument for a remand is a combination of the first two arguments—namely, the ALJ played doctor in too many instances, and should have sought the assistance of an expert. Additionally, a remand is warranted because the ALJ ignored critical parts of plaintiff's testimony.

Viewed at a general level, the admonition that ALJs should not play doctor seems fairly straightforward and easy to articulate. Because ALJs are not medical doctors, they cannot reliably interpret technical medical records or make independent diagnoses. *See, e.g., Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (the ALJ should "rely on expert opinions instead of determining the significance of particular medical findings themselves"); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").One concrete example cited in recent case law is interpreting MRI reports. *See, e.g., Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018). However, in practice, the rule is not always easy to apply. As the Government notes, the Seventh Circuit has affirmed ALJs in some cases (the Government refers to it as "a number of cases") where ALJs "evaluated medical records"—*i.e.* where they arguably engaged in some degree of doctor-playing. Dkt. #15 at 8-9.[3] In such cases, the ALJs could be viewed as merely noting or summarizing the evidence, rather than interpreting it or using it to reach a deeper diagnosis

---

[3] The cases cited by the Government to support this claim are the following: *Summers v. Berryhill*, 864 F.3d 523 (7th Cir. 2017); *Dixon v. Massanari*, 270 F.3d 1171 (7th Cir. 2001); *Knight v. Chater*, 55 F.3d 309 (7th Cir. 1995).

different from the ones made by the doctors. The bottom line is that there do not appear to be many clear rules to determine when the doctor-playing line is crossed.

Turning to the present case, two predicate facts set the stage for the doctor-playing argument. First, the ALJ did not call a medical expert at the hearing.[4] Second, the two State agency doctors rendered their opinions in August and September of 2015, more than a year before the hearing and before the 200 pages of additional medical evidence were tendered. As a result, the ALJ necessarily analyzed this evidence based only on his layperson judgment. But the relevant question is whether, as the Government argues, the ALJ's doctor playing could be viewed as not being material, largely because the new evidence did not reveal any dramatic changes from the earlier evidence considered by the two State agency doctors.

The Court agrees with the Government that some of the specific doctor-playing cited by plaintiff could be deemed harmless errors. We can start with what plaintiff seems to believe is her best argument. This is the claim that the ALJ mistakenly confused two similar-sounding medical conditions—"psoriasis" and "psoriatic arthritis." Relying on the Mayo Clinic website, plaintiff argues that the former condition only affects the skin, whereas the latter condition affects both the skin and joints and is overall much more serious. This argument brings to mind Mark Twain's famous quip that the difference between the right word and the almost right word is like the difference between the lightening bug and lightening.

But the problem with this argument is that the textual evidence for it is ambiguous. The main piece of evidence is that the ALJ used the word "psoriasis" (rather than "psoriatic

---

[4] It does not appear that plaintiff's counsel ever asked the ALJ to seek an updated opinion. Also, plaintiff's counsel chose not to procure an independent medical opinion. These facts weaken the rhetorical force of plaintiff's argument.

arthritis") in describing the impairments at Step Two. This is true, and it does appear to be that this one instance was a linguistic slip of the pen, so to speak. But later in the opinion, the ALJ used both terms, and evaluated both conditions, as evidenced by the separate listings 14.09 and 8.05. Thus, rather than viewing this as evidence of confusion, another explanation is that the ALJ was simply being thorough. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading."). But a bigger obstacle to this whole argument is that the evidence plaintiff even had psoriatic arthritis is debatable. Notably, Dr. Hovis twice found no evidence for it.

Plaintiff also alleges that the ALJ played doctor in the listing analysis. But here again, the Court finds any error to be harmless. Plaintiff has not made a colorable argument that the ALJ's listing analysis was wrong. *Cf. James E. v. Berryhill*, 357 F.Supp.3d 700, 702-03 (N.D. Ill. 2019) (finding that a medical expert should have been called to confirm ALJ's listing analysis because the plaintiff pointed to "enough evidence to make a *colorable* argument that [the listing] might apply") (emphasis in original). Of the four listings at issue, the only one that plaintiff even makes an argument for is 14.09 ("Inflammatory arthritis"). But plaintiff does not discuss the specific requirements of that listing. The ALJ found it was not met because plaintiff had not shown "persistent and severe manifestations of inflammatory arthritis." R. 18. To support this conclusion, the ALJ cited to Dr. Hovis's findings. *Id.* Given that plaintiff has not challenged this evidence, nor pointed to other evidence showing that plaintiff could *possibly* meet the specific requirements, plaintiff has not made a prima facie case. For example, listing 14.09 contains four alternative tests, and plaintiff has not even identified which one she believes she could meet. Without some initial showing of a viable pathway, the Court is unwilling to hold that the ALJ

was obligated to call a medical expert, which again was a request plaintiff's counsel apparently never made to the ALJ.

Although the Court agrees that the ALJ was playing doctor to some extent in the above examples, the Court does not find that these instances, on their own, justify a remand. But the doctor-playing argument is stronger when considered in relation to the credibility analysis and the analysis of the medical opinions.

The ALJ's credibility analysis consisted of the following paragraph:

> Overall, the undersigned finds the claimant's allegations only partially consistent with the medical evidence. As discussed above, medical imaging of the claimant's spine has shown only mild changes, and physical examinations have failed to produce findings to support the degree of pain and other limitations alleged by the claimant. The claimant demonstrated a normal gait and station, 5/5 strength in the extremities, and intact sensation. Moreover, the claimant did not see a pain management specialist until September 2016, and she is not on any prescription pain medication other than topical ointment (Ex. 17E).

R. 21. This paragraph sets forth two main rationales. However, both of them rest on unstated medical assumptions.

The first rationale was that the objective evidence was mild. This rationale rests on the assumption that plaintiff would not have had the degree of pain she alleged to be having without there being stronger supporting objective evidence. But this assumption is not always true for all conditions, in particular with fibromyalgia. *See Harbin v. Colvin*, 2014 WL 4976614, *5 (N.D. Ill. Oct. 6, 2014) ("Fibromyalgia is diagnosed primarily based on a patient's subjective complaints and the absence of other causes for the complaints."). This is why a medical expert is advisable when the claimant makes a credible allegation of fibromyalgia. *See Stokes v. Astrue*, 09 CV 972, 2010 U.S. Dist. LEXIS 86746, *18 (S.D. Ind. Aug. 23, 2010) (due to the nature of fibromyalgia a medical expert would be a benefit). Here, the ALJ basically lumped all of

plaintiff's alleged impairments into one large category without distinguishing the symptoms for each. But this raises the concern that the ALJ may have used the wrong criteria for some of them. In particular, the mild objective findings the ALJ cited concerned plaintiff's gait and muscle strength. But it is not clear whether these findings were relevant to the diagnosis of fibromyalgia, which focuses more on tender points. Dr. Hovis noted many of the same normal findings the ALJ cited, but still seemed to believe that plaintiff was suffering from fibromyalgia. The Court is not in a position to make any definitive judgments one way or another on these questions, but merely holds that they need an evaluation from a medical expert to ensure that the conclusions are fair and reliable. *See, e.g., Akin*, 887 F.3d at 317-18 ("The MRI results may corroborate Akin's complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion.")

But even if the ALJ's evaluation of the objective evidence was valid, the ALJ was required to have at least another rationale to support a credibility finding. *See Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) ("an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain"). The ALJ's second rationale was that plaintiff had a limited treatment history. This is a valid issue to consider. *See* SSR 16-3p (factors 4-6). However, the Court is again concerned that the ALJ's analysis rested too heavily on medical assumptions. As for specialists, the ALJ did not explain what other specialists plaintiff should have been seeing. She was seeing a pain specialist (albeit late in the game) and had already seen a rheumatologist. The ALJ seemed to believe that further effective treatments were available, but this is not always the case. *See* SSR 16-3p ("A medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual."). This possibility has been noted for fibromyalgia. *See* Mayo Clinic

Website, "Fibromyalgia: Treatment" ("The emphasis is on minimizing symptoms and improving general health. No one treatment works for all symptoms."). The same concerns apply to the ALJ's suggestion that plaintiff should have been taking additional medications.

An additional problem with the credibility analysis is that it was incomplete. Specifically, the ALJ failed to acknowledge several possible explanations plaintiff gave for the allegedly minimal treatment. She testified that she was leery of taking stronger medications because both of her parents were addicts. She also mentioned problems with insurance. She also described how she had tried medications, including Gabapentin, Tramadol, and Effexor, but found that they were ineffective or caused side effects, such as fogginess. However, the ALJ mentioned *none* of these explanations in the decision. This was an error. The law is clear that an ALJ cannot rely on "sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for lack of medical care before drawing a negative inference"). Here, for the most part, the ALJ conducted the requisite exploration during the hearing, but then in the written decision, failed to acknowledge plaintiff's answers. It may be possible that the ALJ had a reasonable basis for not believing plaintiff (for example, did plaintiff inform her doctors about her concerns with taking medications?), but we are not even able to evaluate these deeper questions because the ALJ swept plaintiff's explanations under the rug.

Ultimately, plaintiff's doctor-playing argument implicates a larger important question, one not adequately resolved in this Court's view. This is whether plaintiff's condition materially changed after the Agency opinions. The parties offer competing theories. Plaintiff alleges that

her condition deteriorated, with her having to undergo increasingly more aggressive treatments after the summer of 2015. If true, then this strengthens her argument that a medical expert was needed to assess the additional 200 pages of new evidence. *See Monero v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) ("An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion."). The Government argues that the ALJ reasonably concluded that plaintiff's condition was largely unchanged. If true, then the ALJ's analysis could be viewed as merely resting on an observation that the new evidence was the same as the earlier evidence.

However, the ALJ did not squarely address this issue—in fact, the ALJ gave mixed signals. When analyzing the two Agency opinions, the ALJ seemed to endorse the theory that plaintiff's condition was worsening. The ALJ gave Dr. Dow's opinion more weight than Dr. Arjmand's based on recent imaging showing spinal deterioration. Under this reasoning, a credible argument can be made that an expert was also needed to assess whether subsequent imaging showed even further deterioration. However, in another part of the decision, the ALJ took an opposite tack. The ALJ noted that, up until shortly before plaintiff's onset date in December 2014, she was working as a home health aide for her aunt, a job classified at the medium level. The ALJ then noted that plaintiff had not alleged any "acute exacerbation" in her symptoms, thus implicitly undermining the deterioration theory. R. 22.[5] These two rationales are

---

[5] A separate criticism of this argument is that the ALJ again ignored plaintiff's testimony. At the hearing, the ALJ directly asked plaintiff how she could do medium work given her alleged condition. Plaintiff explained that her unique work situation—living at home and treating a close family member—gave her the flexibility to structure her tasks around her limitations (*e.g.* "if I had to sweep or mop, I could take a rest"). R. 44. The ALJ asked plaintiff if she could have done the same work in a more traditional job setting, and plaintiff stated that she could not. She also noted that the caseworker who was supposed to do a yearly visit had not come by to check in three years. R. 55. This is another instance in which the ALJ failed to acknowledge testimony contrary to his rationales.

13

in tension with each other, one suggesting deterioration with the other one pulling against that conclusion.

The above conclusions are enough to order a remand. The Court, therefore, need not address plaintiff's remaining arguments in depth. The Court notes that plaintiff has raised some valid concerns regarding the ALJ's rejection of the two opinions from Dr. Norem. Here again, the doctor-playing issue comes into play. For example, the ALJ assumed that six (or three) treatment visits were not enough to render a valid judgment regarding plaintiff's particular collection of impairments, but it is not clear whether this assumption is medically grounded. Likewise, the same concerns about the objective evidence, as noted above, apply to the analysis of Dr. Norem's opinions.

On remand, the ALJ should call a medical expert to address all these issues and any others not addressed herein. In remanding this case, the Court is not indicating that the ALJ must rule a particular way or that the ALJ's current rationales, if supported by an appropriate medical opinion and made after a fair review of the factual record, could not be relied upon to support a finding that plaintiff was not disabled.

## CONCLUSION

For the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is reversed and remanded for further proceedings.

Date: December 5, 2019        By: _Lisa A. J_____
                                                          Lisa A. Jensen
                                                          United States Magistrate Judge